Filed 9/21/21  In re C.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.H. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E076904 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1900381) |
| v. | OPINION |
| S.H. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge. Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant S.H.

Sara Vaona, under appointment by the Court of Appeal, for Defendant and Appellant T.H.

1

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court terminated the parental rights of S.H. (Mother) and T.H. (Father; collectively, Parents) to their children, C.H., V.H., and S.H. (collectively, the H-children). Parents contend the juvenile court erred by denying their requests to reinstate their reunification services. (Welf. & Inst. Code, § 388, subd. (b).)[1] We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A.    BACKGROUND

Mother has seven children. The H-children are Mother's three youngest children, and Father is their father. The H-children were born during the years of 2014 to 2018. Parents are married. The father of Mother's four oldest children is R.L. (L-Father). The four oldest children are C.L., O.L., E.L., and H.L. (collectively, the L-children). The L-children were born during the years of 2005 to 2011.

### B.    DETENTION AND JURISDICTION

On June 4, 2019, Riverside County Department of Public Social Services (the Department) received a referral reflecting that Father broke Mother's femur during a domestic violence incident. It was also alleged that Father abused methamphetamine. On June 25, 2019, Mother told a Department social worker that "there is constant domestic violence in the home." Mother said "that she 'knows that it is not safe' and

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

2

stated that the 'house is unimaginable. [Mother] stated that [Father] constantly hurts her and she does not know what to do." Mother said that, on June 11, 2019, Father shoved Mother's head into a wall, and then Father locked himself in the garage and threatened to kill himself. Mother believed Father was abusing methamphetamine.

A police report from June 11, 2019, reflected Mother suffered pain in her neck and back "from an incident earlier in the day. [Mother] stated that in the past [Father] has caused a hairline fracture of her femur and a retina injury that required surgery." On June 11, Father was arrested for spousal battery. (Pen. Code, § 243, subd. (e)(1).) On June 13, Father was convicted of the offense and granted three years of summary probation. The criminal court issued a no-negative contact order protecting Mother from Father.

When speaking with the social worker on June 25, Father denied engaging in domestic violence and denied abusing drugs. Father declined to submit to a drug test. L-Father told the Department social worker that he lived in Illinois and did not know that Father was living with Mother.

On June 26, 2019, the Department detained the L-children and the H-children. While in the car with the social workers, E.L. and H.L. said Father "always hurts [Mother] by hitting her and strangling her. [H.L.] stated that [Father] would even hit him and the other children in the face. [H.L.], stated that the only children who do not get hit are the children, [V.H.] and [S.H.], because they are still babies. [H.L.] stated that he is constantly scared of [Father] because he says things to [Mother] like that he is going to 'slit the throat' of [Mother.]"

3

C.L., Mother's eldest child, told the social worker that C.L. was injured while trying to defend Mother from Father. "[W]hen attempting to break up the physical fights between [Parents]," Father would push C.L. causing her to "fall and hit [her]self on stuff." C.L. said that, on one occasion, Father told C.L. she could not go outside, so C.L. asked Mother if she could go outside to play with a friend on the porch and Mother said she could go. C.L. went out on the porch. Father " 'came down stairs [*sic*] and was hitting [C.L.] with the belt. On [her] butt and mostly on [her] thigh.' " "The boys," who we infer are C.L.'s brothers, were " 'screaming for [Mother] to save [C.L.]' " but " '[M]other did not make [Father] stop.' "

V.H. and S.H. were placed together in a foster home. C.H. was admitted to the hospital due to having type 1 diabetes and needing specialized medical care. C.H. remained in the hospital for weeks while awaiting a foster home for medically fragile children. Prior to the detention, Mother, Father, the L-children, and the H-children resided with Father's parents (Grandparents). After the detention, Parents were no longer allowed to reside in Grandparents' home and Grandparents planned to change the locks.

At the jurisdiction hearing, the juvenile court found true the allegations that (1) Parents placed the children at risk of physical and emotional harm by exposing the children to acts of domestic violence; (2) Father has a history of substance abuse and his current behavior is consistent with abusing controlled substances, which impacts his ability to provide adequate care for the L-children and H-children; and (3) Father has a criminal history, including spousal battery, and is currently on summary probation, and

4

those "conditions place the child[ren] at risk of suffering serious physical harm and neglect." (§ 300, subd. (b).)

The juvenile court granted L-Father sole custody of the L-children and terminated jurisdiction as to the L-children. The juvenile court ordered the H-children remain in foster care. The court granted Parents supervised visitation with the H-children two times a week, as well as reunification services. The juvenile court advised Parents that, because the H-children were so young, Parents had to make progress in reunifying with the H-children within the first six months or their reunification services would be terminated.

## C. SIX-MONTH REVIEW HEARING

### 1. *MOTHER*

Mother asked to have her twice weekly visits combined into one longer weekly visit, and that request was granted. Mother missed visits with the H-children on September 9, 16, and 30; October 7 and 14; and November 19. Mother attended all of her visits from November 25, 2019, through January 28, 2020. Mother missed visits on February 25 and March 3. On February 25, the H-children waited in the Department's Office for Mother. C.H. was confused as to why she had to leave without seeing Mother and was disappointed to learn that "[M]other was not going to come." For most of March 2020, the Department tried to contact Mother without success. The Department reestablished contact with Mother in April 2020. Mother missed visits with the H-children on April 29; May 11 and 22; and June 3. Sheriff's deputies were looking for Mother because she tried to cash what appeared to be a stolen check at the Soboba

5

Casino on January 17, 2020, and, in March 2020, she "was 'squatting in a house in Idyllwild and 'trashed the place.' "

2.    *FATHER*

In August and September 2019, Father failed to attend multiple visits with the H-children and Father was late to multiple visits with the H-children, which resulted in the visits being canceled. In October 2019, Father told the social worker that he did not want to visit the H-children until he completed an inpatient drug treatment program. On December 17, 2019, Father entered an inpatient drug treatment program. On December 21, 2019, Father was discharged from the program due to fighting with another patient. In April 2020, Father contacted the Department about resuming visits with the H-children.

3.    *V.H. AND S.H.*

V.H. and S.H. continued to reside in the same foster home. V.H., who was three years old, was meeting her developmental milestones with the exception of emotional regulation. V.H. had "daily, intense tantrums, triggered by the slightest challenge or confusion." The foster parents worked with V.H. to reduce the number of tantrums. In April and May 2020, after visits with Father, V.H.'s behavior regressed and her anger increased. V.H. began "hitting the other children in the home and spitting on people." In May 2020, V.H. was referred to therapy.

S.H., who was one year old, would not cry to have his needs met when initially placed in the foster home, i.e., he was silent; he also had "intense nightmares." Since

6

being in the foster home, S.H. learned to express his needs, and the nightmares stopped in October 2019.

4.  *C.H.*

C.H., who was five years old, resided in a separate foster home for medically fragile children. C.H. "require[d] constant monitoring and daily insulin injections" due to her Type 1 diabetes. Upon arriving in her foster home, C.H. "seemed to go to anyone for affection such as neighbors, strangers, and visiting family members." The foster parents worked with C.H. to teach her safety. C.H. suffered nightmares, which "worse[ned] around the days that she has visitation with her parents." C.H. "anger[ed] easily and display[ed] anxiety." When C.H. was angry she clenched her fists. During one angry incident, C.H. "hit the caretaker in the face." When Parents failed to attend visits, C.H. experienced anger and anxiety for several days. C.H.'s blood sugar level rose on the days visits were scheduled with Parents, and it remained elevated for days when Parents missed visits.

In March 2020, C.H. shared that she had, in the past, witnessed domestic violence between Parents. C.H. described standing between Parents, trying to push them apart. On one occasion, when she stood between them, Father "pushed her so hard she hit the wall and . . . it hurt." On another occasion, Father "pushed her, she fell back onto the couch, and that did not hurt as bad." C.H. began receiving weekly therapy sessions.

After a video visit with Father on April 17, C.H. urinated on the bathroom floor and "suddenly appeared to be very afraid of the foster father and began screaming

7

uncontrollably with a wide-eyed look while thrashing about." After the foster parents calmed C.H., C.H. "was asked what made her scream that way and she started crying and whispered, 'My dad . . . my mommy getting hurt.' "

After a video visit with Father on April 29, in which Father was at Grandparents' home, C.H. argued with a boy at her home and pinched him so hard that it left a bruise. When the foster parents spoke to C.H. about her actions, "she did not seem to understand the consequence[s] of hurting someone." When asked why she was so angry, C.H. said it was due to seeing Grandparents' home where Parents " 'used to fight every day.' " On May 13, 2020, after a video visit with Father, C.H. "peed in her pants on the bathroom floor" and "began to pick at the skin on her belly button causing it to bleed."

5. *HEARING*

The six-month review hearing occurred approximately one year into the case, on June 17, 2020. The juvenile court terminated Father's reunification services and reduced his visits to once a month for two hours. The court continued Mother's visits and reunification services.

D. TWELVE-MONTH REVIEW HEARING

1. *MOTHER*

Mother overdosed on drugs and was taken to the hospital. On June 24, 2020, Mother's visit was canceled because she appeared to be under the influence. Mother's visits on July 1 and 8 went well. On July 15, Mother's visit was canceled because she appeared to be under the influence. On July 22, Mother failed to attend the visit. On

July 29, Mother tested positive for cocaine and appeared to be under the influence so the visit was canceled.  Mother failed to attend visits on August 4, 12, and 21.  On August 21, a Department social worker told Mother that the H-children "were waiting for [Mother] at the office for the four[th] visit she missed" and that "created a lot of confusion for the children."  Mother failed to attend visits on September 8, 14, and 21.

### 2.     *THE H-CHILDREN*

V.H. had angry reactions to Mother missing visits.  V.H. continued to have regressive behaviors when angry, such as defecating in her pants.  V.H. also screamed, cried, and kicked doors and walls uncontrollably to the point "that the windows of the house shake."  V.H.'s foster parents were working with her on reacting to stressful situations.  C.H. also displayed regressive behaviors due to Mother missing visits.  C.H. threw tantrums and had nightmares.

### 3.     *FATHER*

On June 26, 2020, Father completed a seven-day detox program.  On June 30, Father entered a residential substance abuse treatment program.  On August 25, Father transitioned to an outpatient treatment program.

### 4.     *HEARING*

The 12-month review hearing took place on September 29, 2020.  The juvenile court terminated Mother's reunification services and reduced the frequency of her visits to once a month.

E.    REQUESTS TO CHANGE COURT ORDERS

1.    *OCTOBER 2020 TO JANUARY 2021*

a.    Parents

In October 2020, Father remained in outpatient drug treatment, and he tested negative for drugs. Mother was late for her October visit, so the visit was canceled. In November 2020, Mother moved into a sober living facility. Mother then began participating in monthly visits with the H-children. The H-children were happy to see Mother during visits and "are always excited for the presents that [Mother] brings to the visits."

b.    C.H.

C.H. was six years old and meeting her developmental milestones. C.H. bonded with her foster family and said "she 'wants to live with them forever.' " C.H.'s foster parents were committed to adopting her. C.H.'s blood sugar continued to spike when she was stressed or anxious. C.H. worried when Mother failed to attend visits. When Mother did attend visits, afterward, C.H. was "insecure and clingy to the adults in the [foster] home." For example, C.H. would "follow the adults in the home around all day." C.H. enjoyed visiting Mother but expressed that "she is worried about [Mother] because [Father] would hurt [Mother]." C.H. continued to have nightmares about Father hitting Mother.

C.H.'s behavior regressed after visits with Father. For example, C.H. continued to urinate on the bathroom floor and have tantrums. Ultimately, C.H. refused to participate in visits with Father because she did not want to visit him. C.H. did not want

to visit Father because "she is afraid of [Father] and fears he will hurt her, and [M]other." Father was angry about C.H.'s lack of participation in the visits; he did "not understand how a child her age can make th[e] decision" to not visit; and he did "not understand that the Department cannot force [C.H.] to visit."

### c.     V.H. and S.H.

V.H., who was four years old, had stopped hitting other children in the home. However, after visits with Parents, V.H. "will get upset and hit and punch things," such as furniture. V.H.'s foster parent was making progress with helping V.H. through her tantrums. V.H. said she loved her foster home and foster family. S.H., who was two years old, was "a very social, happy child." The foster parents were committed to adopting V.H. and S.H.

### d.     Family Connections

C.H.'s foster parents and V.H. and S.H.'s foster parents have known one another for more than 20 years. The two families vacation together and participate in activities together, so C.H. visits V.H. and S.H. on a weekly basis. The H-children had video visits with the L-children once or twice a month. Grandparents wanted the H-children to remain in the foster parents' care.

## 2.     *REQUESTS TO CHANGE COURT ORDERS*

### a.     Mother's Request

On January 20, 2021, Mother requested the juvenile court reinstate her reunification services. (§ 388.) Mother asserted circumstances had changed in that she was residing in a sober living facility, participating in 12-step meetings and counseling,

11

and was expected to complete domestic violence and parenting classes by January 25, 2021. Mother asserted the reinstatement of services would be in the H-children's best interests because the H-children could live together and potentially be reunited with the L-children. The juvenile court ordered a hearing on Mother's request.

### b. Father's Request

On January 25, 2021, Father requested the juvenile court reinstate his reunification services. (§ 388.) Father asserted circumstances had changed because he completed a seven-day detox program and a 60-day inpatient substance abuse treatment program; he continued to participate in outpatient treatment; he tested negative for controlled substances; he participated in parenting classes and anger management classes; and he had "loving, bonded visits." Father asserted the reinstatement of services would be in the H-children's best interests because Father "conquer[ed] his addictions [and] anger issues" and was "ready to be the best father he can be for his children." The juvenile court ordered a hearing on Father's request.

### c. The Department's Responses

As to Mother's request to change a court order (§ 388), the Department contended Mother did not demonstrate that she was able to maintain her sobriety outside of the sober living facility, so it would not be in the H-children's best interests to provide Mother further reunification services. In regard to Father's request to change a court order (§ 388), the Department contended Father did not complete a domestic violence program or otherwise address his domestic violence issues, so he failed to demonstrate changed circumstances.

12

3. *JANUARY 2021 TO APRIL 2021*

a. <u>C.H.</u>

The hearing for the H-children's permanent plan was originally scheduled for January 25, 2021. C.H. and V.H. were present in court for the hearing. The juvenile court continued the hearing to March due to Mother's and Father's requests to change the court's orders (§ 388). In the days leading up to January 25, C.H. was afraid she would have to move out of her foster home. She had "many tantrums"; she suffered nightmares; her blood sugar became unstable; and she was hospitalized. In March, as the continued hearing date approached, C.H. again began to exhibit anxiety, such as "picking at her ears until they bleed." C.H. said she was worried about having to leave her foster home and she wanted "to know that she can stay [in the foster home] forever."

On March 4, the juvenile court continued the matter to April 9, 2021. During March 2021, C.H.'s behavior "greatly regressed." C.H. bit her foster father on his shoulder, leaving a mark through a thick sweater, and C.H. began disposing of her feces in a trashcan, rather than the toilet. C.H. "said repeatedly that she is afraid she will have to leave [the foster parents'] house and go live with her parents." C.H. began participating in "a more intensive, trauma-focused therapy."

b. <u>V.H. and S.H.</u>

During March 2021, V.H. became "increasingly aggressive. She anger[ed] easily and . . . scream[ed] a high-pitched uncontrollable scream for extended period of time for little reason. She [was] unable and often unwilling to express herself verbally in a

13

healthy way." On March 31, 2021, a butter knife was left on the kitchen counter after making sandwiches. V.H. asked her 11-year-old foster brother to give her chocolate. The brother said no because V.H. just finished eating chocolate. V.H. became "extremely angry and grabbed the knife and pointed it at him in a threatening manner. [The brother] said she had a very scary look on her face." V.H. "would not apologize at the time" and "screamed in a fit of rage for over an hour." On April 1, V.H. hit her foster sister.

V.H.'s foster parent explained, "[V.H.] and [S.H.] have monthly visitation with . . . [M]other and [F]ather separately. [V.H.] loves getting gifts at the visits. We see a regression in [V.H.'s] behavior before the visits and both [V.H.] and [S.H.'s] behavior after the visits. [V.H.] expresses anger and sadness over her biological family. We make progress with therapy and the strategies we are learning in therapy toward [V.H.'s] healing, but then she regresses after each visit. Her behavior is getting significantly more volatile." V.H. continued to attend therapy. S.H. began mimicking V.H.'s behavior by screaming when V.H. screamed and hitting the other children in the home without provocation. In March 2021, S.H.'s pediatrician wrote a letter reflecting S.H. was delayed in "speech and communication and shows developmental delays." S.H. had "marked delays in communication, problem solving, and personal-social."

c.      <u>Mother</u>

In February 2021, Mother completed her twelfth counseling session, which she started in November 2020. Mother was "diagnosed with Major Depression . . . and Amphetamine Abuse in Early Remission."

4.      *EVIDENTIARY HEARING*

a.      <u>Mother's Request</u>

On April 9, 2021, the juvenile court held an evidentiary hearing on Mother's and Father's requests to reinstate reunification services. Mother's attorney asserted that Mother had completed parenting classes and domestic violence classes; Mother had completed her substance abuse treatment goals and was scheduled to be discharged from the outpatient program; and Mother's free stay at the sober living facility had ended, but she continued living there as a paying resident, and the H-children could live in the facility. Additionally, Mother had obtained a job with the Postal Service. Mother's attorney asserted that the evidence demonstrated changed circumstances.

As to the H-children's best interests, Mother's attorney contended Mother's visits with the H-children went well. V.H. asked to spend Easter with Mother. Mother and the H-children were affectionate with one another, and the H-children ran toward Mother smiling. Mother's attorney asserted that if the H-children were returned to Mother then they could reside together and possibly, one day, also be reunited with the L-children. Mother's attorney asserted that Mother was seeking to regain custody of the L-children. In regard to V.H.'s regressive behavior, Mother's attorney asserted the

dates provided by V.H.'s foster parent, e.g., March 31 and April 1, did not correlate with Mother's and Father's visits.

The Department asserted six more months of services were not in the H-children's best interests due to the regressive behaviors suffered by V.H. and C.H. after the visits, and C.H.'s medical issues after the visits. The Department questioned what further damage could be inflicted upon the H-children by six more months of increasing visitation.

The juvenile court found Mother demonstrated changed circumstances because Mother had stabilized her life. However, the court concluded that Mother did not establish the requested change was in the H-children's best interests. The court found that the H-children needed stability and requiring them to spend another six months "questioning every day 'what is going on with my life' is not healthy. [¶] For them— for every single one of these children, it will then be at least half of their lives will be spent in the chaos of the dependency courthouse. And I challenge any adult in this courtroom to say, 'Yes, I would like to spend half of my life living in the chaos of dependency court, not knowing where my real home is.' [¶] It's no wonder that these kids have emotional issues, having to live through that chaos." The court found the H-children were thriving in their foster homes and that it would be in their best interests to remain in those homes. The court denied Mother's request to reinstate reunification services.

b. Father's Request

Father testified at the April 9, 2021 hearing. In two weeks Father's anger management course, which was part of his outpatient drug treatment, would be complete, and as part of that course, he worked on domestic violence issues. Father also discussed domestic violence during therapy sessions. However, Father did not complete the 52-week domestic violence course that was required for his summary probation, and he did not complete the Department's 16-week domestic violence course.

In regard to Father's request to change a court order, Father's attorney asserted circumstances had changed because Father participated in substance abuse treatment and was sober. Further, Father was completing anger management classes. The Department asserted Father did not demonstrate changed circumstances because he did not complete a domestic violence program.

The juvenile court found Father failed to demonstrate changed circumstances. The court explained that the case started due to Father's "extreme violence," which "happened repeatedly." The court said, "[T]here is something inherently positive about attending a 52-week batterer's course, and because it shows over a long period of time, week in and week out, you're out there talking about your domestic violence, and it shows a pattern of someone who is willing to confront the fact that they have committed domestic violence and are willing to spend at least a year dealing with that. And Father didn't do it." The juvenile court noted that Father was given the paperwork for the 52-week course when he was placed on probation and again when he was found to have

17

violated his probation.  Thus, Father was aware of the course but it "wasn't a big priority for him."  The court denied Father's request to reinstate services.

## DISCUSSION

### A.    LAW AND STANDARD OF REVIEW

"Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability."  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  If a parent wants to revive the issue of reunification, then the parent must do so via a request to change a court order (§ 388).  (*Marilyn H*., at p. 309.)  "To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child.  [Citation.]  'The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion.' "  (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

### B.    MOTHER'S APPEAL

Mother contends the juvenile court abused its discretion by finding that reinstating reunification services was not in the H-children's best interests.

Our Supreme Court commented on the timelines in dependency court, writing, "It must be remembered that up until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency.  This could be for a period as long as 18 months.  Another four months may pass before the section 366.26 hearing is held.  While this may not seem a

18

long period of time to an adult, it can be a lifetime to a young child. Childhood does not wait for the parent to become adequate." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.)

Father broke Mother's femur and damaged her retina, which required surgery to repair. C.H. and V.H. were so traumatized by their violent experiences with Parents that, after more than 18 months of being in foster care, at ages six and four, they both remained in therapy to heal from the trauma.

The H-children were detained on June 26, 2019. The hearing on the requests to change court orders took place on April 9, 2021. Thus, for over a year and a half, the H-children did not know whether they would be returned to Mother, returned to Father, or remain in their foster homes.

After more than a year and half of that uncertainty, which had been preceded by years of trauma, C.H. and V.H. grew increasingly more volatile. C.H. was disposing of feces in a trashcan. V.H. threatened her foster brother with a butter knife. The juvenile court could reasonably conclude that, after the traumatic violence they experienced and then a year and a half of uncertainty concerning their family and living situations, C.H. and V.H. were emotionally exhausted and needed the dependency proceedings to conclude in order to have the comfort and security that comes with permanency. Thus, continuing the case for another six months of reunification services would not be in C.H.'s and V.H.'s best interests.

S.H. was diagnosed with developmental delays, which required "speech therapy, occupational therapy, and ABA."[2] S.H. spent all but six months of his life in the care of his foster parents. Thus, the foster parents filled the parental role for S.H. for most of his life. The juvenile court could reasonably conclude that, given S.H.'s developmental delays and that the foster parents were S.H.'s parental figures, his best interests would be served by the stability that would come from permanency, and that continuing the case for another six months would not be in his best interests.

In sum, the juvenile court could reasonably conclude that providing Mother with another six months of services and increasing her visits with the H-children would not be in the H-children's best interests because it would intensify and prolong the H-children's uncertainty regarding their living situations, which would, in turn, result in more volatile behavior from C.H. and V.H. and result in confusion for S.H. who was dealing with developmental delays and who saw his foster parents as his parents.

Mother asserts that the juvenile court erred by denying her request to reinstate services because the H-children would suffer the loss of their bond with Mother and would lose the opportunity to be reunited with the L-children. At the time of the section 388 hearing, Mother's reunification services had already been terminated. Those services were terminated, in part, because Mother repeatedly missed visits. Also at the time of the section 388 hearing, the H-children were only visiting with Mother once a month. Between Mother's missed visits and the visits being once a month, the H-

---

[2] We surmise that "ABA" is applied behavior analysis.

20

children already had the experience of rarely seeing Mother. The denial of Mother's section 388 petition meant visitation would not *increase* from the existing minimal amount. The juvenile court could reasonably conclude that the H-children had already grieved the loss associated with rarely seeing Mother because the H-children had dealt with that situation for over a year.

In regard to the opportunity to be reunited with the L-children, there was no indication that such an opportunity was readily available. It was unclear how far along Mother was in the process of gaining shared custody of the L-children. Additionally, if Mother obtained shared custody of the L-children, it was unclear how much time the L-children would reside with Mother, as opposed to residing in Illinois with L-Father. Given the uncertainties, one could conclude there was only a slight chance of the H-children and the L-children being reunited in the near future. Providing Mother another six months of services based upon what may be a slight chance would not have been in the H-children's best interests given the H-children's need for stability. (See *In re Edward H.* (1996) 43 Cal.App.4th 584, 594 ["[T]he prospect of an additional six months of reunification to see if the mother would and could effectively separate from the father would not have promoted stability for the children and thus would not have promoted their best interests"].)

C.    FATHER'S APPEAL

Father contends the juvenile court erred by finding he did not establish changed circumstances.

21

When seeking to change a court's order, the petitioning parent "must show *changed*, not changing, circumstances. [Citation.] The change of circumstances . . . 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

In September 2019, Mother described the domestic violence in the home as "constant" and "stated that the 'house is unimaginable.' " Both C.L. and C.H. described trying to separate Parents during fights and being pushed and injured by Father in the process. At the jurisdiction hearing, the juvenile court found true the allegations that Father placed the children at risk of physical and emotional harm by exposing them to acts of domestic violence; and the court found that Father has a criminal history, including spousal battery, and is currently on summary probation.

Father failed to complete the 52-week domestic violence course that was required for his probation, and he failed to complete the Department's 16-week domestic violence course. Father did some work on the domestic violence issue in his outpatient substance abuse program, but by avoiding the required classes specifically designed for domestic violence offenders, Father demonstrated that he could not or would not confront the problems that led to this dependency. Given the extreme and pervasive nature of Father's domestic violence, the juvenile court reasonably found that Father needed to attend a course like the 52-week domestic violence course designed for offenders in order to demonstrate that he was trying to reach the root of his domestic violence problem so as to change his behavior. Because Father avoided the required

domestic violence courses, the juvenile court reasonably concluded that Father failed to demonstrate changed circumstances.

Father contends perfect compliance with a case plan is not required to demonstrate changed circumstances, and therefore, Father's request should not have been denied based upon his failure to complete domestic violence classes. We are not concluding that Father's request (§ 388) was properly denied because he failed to complete his case plan. Rather, we are concluding that the evidence indicates Father had a pervasive and severe domestic violence problem, and without evidence of consistent, repeated, and long-term work on Father's part to directly address the domestic violence problem, e.g., participating in the 52-week class for offenders, the juvenile court reasonably concluded that Father failed to demonstrate he resolved the severe and pervasive problem.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
Acting P. J.

We concur:

SLOUGH _____
J.

RAPHAEL _____
J.